1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES GARRETT,

11              Petitioner,              No. CIV S-03-2613 GEB KJM P

12        vs.

13   J. SOLIS, Warden, et al.,

14              Respondents.              FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus under 28 U.S.C. § 2254.  He challenges his San Joaquin County Superior Court

18   convictions for assault with a firearm and possession of a firearm by an ex-felon on the grounds

19   that trial counsel was ineffective in failing to move to suppress evidence seized as the result of a

20   search warrant; appellate counsel was ineffective in failing to challenge trial counsel's omissions;

21   the jury was improperly instructed; and the trial court permitted the prosecutor to pose an

22   improper hypothetical question to an expert witness.

23   I.  Factual And Procedural Background

24              The state Court of Appeal provides the following, thorough recitation of facts

25   applicable in this case:

26   /////

1

As presented at trial, the facts and circumstances surrounding the shooting of Muniz [the victim] remain shadowy and murky. Some witnesses heard nothing, others saw and heard contradictory events, and still others offered several different versions of the argument and subsequent altercation between the two men. Unfortunately, this turbid atmosphere necessitates a detailed factual discussion.

On January 3, 2000, Lawrence Delgado heard two or three gunshots sometime after 3:00 o'clock in the afternoon. Delgado went outside and saw two men fighting on the lawn of the house two doors away. A Hispanic man was on top of an older Black man with gray hair. The Hispanic man got up and, holding a gun, headed toward the house. Delgado's wife called the police, and Delgado later recognized defendant as the Black man engaged in the fight.

Responding to a reported shooting, officers arrived at the scene. They found Muniz lying on the floor inside the residence. Muniz bled from two gunshot wounds, one in his chest and the other in his abdomen. Maria Garza knelt over Muniz. A very drunk man, Ulysses Townsell, sat on the couch. A handgun lay on a chair near the front door. When officers asked what happened, Townsell responded vaguely.

Garza told the officers that Muniz, her boyfriend, went across the street to speak with defendant. Muniz returned and told Garza he and defendant had argued over $2. As she looked out the open front door, Garza saw defendant walk up to and into the house, holding a silver gun. Muniz and defendant argued, and the two men went outside. A struggle ensued, and the pair fell off the porch onto the lawn. Muniz landed on top of defendant and the two men fought for the gun. The gun fired twice. Muniz got up and walked in the front door. Garza called the police and, when they arrived, pointed out defendant. Defendant bled from a gash on his forehead and smelled of alcohol. Following defendant's arrest, Garza expressed fear defendant and his family would retaliate if she cooperated with the police.

At trial, Garza denied any recollection of the events surrounding the shooting or of her statements to the police. Garza used both rock cocaine and alcohol. She also suffered from numerous blackouts. She denied any subsequent contact with defendant or his former wife, but then admitted he had called defendant's former wife the previous week. Garza denied anyone threatened her about her testimony. She denied seeing either Muniz or defendant with a gun, and denied defendant ever sold her drugs.

However, an officer who interviewed her at the police station the day of the shooting offered a very different version of events as recounted by Garza. In the interview, Garza stated she had been

2

staying at Townsell's residence for approximately a week when Muniz came looking for her. Defendant came to the house to ask Garza to repay a loan. Muniz paid defendant the $25 Garza owed him. Defendant left, but on the way out he made a sexually explicit comment about what Garza still owed him. Muniz left and then returned. Garza saw defendant approach the house carrying a "little possibly black-colored gun." Defendant came through the front door and began arguing with Muniz. Garza did not know what the pair argued about. Defendant and Muniz began shoving one another, moving to the front porch. The duo fell off the porch onto the lawn. Muniz landed on top of defendant. They struggled over the gun, and Muniz attempted to keep defendant from pointing it toward Muniz. Two or three shots rang out, the struggle ended, and defendant fled into the house. Muniz, bleeding, held the gun. Garza helped him into the house, where he put the gun on a chair and fell to the floor. Garza said Townsell slept through the incident.

During the interview, Garza said she had seen defendant with a small handgun several months earlier. Although at first she avoided the subject, Garza eventually admitted defendant sold her rock cocaine, which was the subject of her $25 debt to him. Although Garza was upset and had been crying, she did not appear intoxicated. She smoked cocaine and drank beer earlier in the day but denied being intoxicated at the time of the shooting. She reiterated she saw defendant approach the house with a gun. Garza admitted being afraid of Muniz because of his previous violence against her.

The prosecutor at defendant's preliminary hearing testified about the version of events Garza related during the preliminary hearing. At the time, Garza was serving a six-month sentence for possession of cocaine base and violating the conditions of the resulting drug diversion program in which she had been enrolled. Garza stated she was drunk the day of the shooting and remembered nothing. Before the preliminary hearing, the prosecutor discussed the possibility of another drug diversion program. Garza agreed to testify at the hearing, but the prosecutor stated no promises were made in exchange for her testimony. After testifying, Garza applied for another diversion program and was eventually released from custody.

At the preliminary hearing, Garza testified she went to Townsell's residence the night before the shooting because Muniz had beaten her. Muniz came the next day to convince her not to testify against him in a court case that might result in his deportation. Muniz went to defendant's residence to repay Garza's debt. After he returned, Garza saw defendant coming up the steps carrying a dark handgun. Muniz was telling Garza about an argument he had with defendant over a pack of cigarettes. Defendant overheard Muniz, and the two men began to argue. The pair continued to argue

3

outside and Garza heard two shots.  She did not see the shooting.
As she went outside she saw the two men on the lawn, Muniz atop
defendant.  The men struggled over the gun defendant held.  Garza
did not see Muniz hit defendant.  Defendant ran into the house and
out the back door.

Isaac Olden, a long-time friend of defendant, also testified.  He
often visited defendant's residence and had observed a black
revolver, belonging to defendant's former wife, at the house.  The
gun was kept on a bathroom shelf.

Olden was present the day of the shooting.  Earlier, he and
defendant returned from a fishing trip, during which they drank
alcohol.  A "Spanish dude" (dude) came over and began talking
about his wife.  Although the dude and defendant did not argue, the
dude began making threats "[a]bout hurting the old man across the
street and his wife and stuff."  Olden heard no dispute about
money.  The dude kept going into and out of defendant's bathroom
and finally left the house.  As the dude was leaving, Olden saw a
"big bulge" at the top of his waistband.

After the dude left, defendant's former wife went into the
bathroom and announced the dude had taken her gun.  Defendant
left the house.  As Olden looked outside, he saw defendant and the
dude fighting in the front yard across the street. . . . Hard of
hearing, he never heard the gunshots or saw the gun.

Banise Garrett, defendant's former wife and current live-in
girlfriend, also testified.  Banise and Garza used rock cocaine
together.  Banise denied defendant sold Garza drugs since
defendant was against drug use.  Banise had seen Muniz strike
Garza several times in the past and knew Garza feared Muniz.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . The day of the shooting, Garza and Muniz arrived at
defendant's house.  Muniz tried to convince Garza not to testify
against him in a domestic violence case so he would not lose his
green card.  He remained at defendant's house after Garza returned
to Townsell's house.

Muniz, Banise, and defendant sat and drank alcohol. Muniz said if
he saw Garza going into a house he would kill everybody in the
house and tell the police everybody was smoking dope.  Banise
believed Muniz was threatening her and her family.

Muniz asked defendant, "How much for a cigarette?"; defendant said he
would sell Muniz a pack for a certain amount.  The men argued.  Banise,
in her room, heard voices raised but not the words spoken.  Muniz left.

/////

4

Olden told Banise he had seen a bulge in Muniz's coat.  Banise searched the bathroom and found that her gun and some money she had hidden were missing.  She told defendant about the discovery, and defendant announced he would go to Townsell's to get the money back.

Banise heard a shot and ran outside.  She saw Muniz sitting on top of defendant, struggling over a gun.  Muniz gained control of the gun and pointed it at defendant.  Banise stepped between them and begged Muniz not to shoot defendant.  Muniz pulled the trigger several times, but the gun failed to fire.  Frustrated, Muniz hit defendant in the head with the gun.  Banise and defendant fled to Townsell's house and out the back door.

. . .  Defendant never saw, touched, or knew of the gun until the day of the shooting.  Banise told him about it after she discovered it was missing. . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Prior to the shooting, Garza told Muniz that defendant sold her drugs.  Muniz disapproved of Garza's drug use.  The day of the shooting, Muniz went to Townsell's house looking for Garza.  Defendant came over and asked Garza to pay the $30 she owed him.  Muniz paid the debt. . . .

Defendant returned to his house; eventually Muniz joined him, and the pair sat around talking.  Defendant offered to take Garza out of town to prevent her from testifying against Muniz . . . .

Muniz asked Banise for a cigarette, then asked if he could use the bathroom.  When Muniz returned from the bathroom, he found an unopened pack of cigarettes on the table.  Defendant said Muniz could open the pack for $4.  Muniz angrily refused . . . .  As he walked out defendant's door, Muniz told defendant he was "going to call the [police] and tell them that [defendant] was dealing with drugs."

Back at Townsell's house, Muniz sat near the open front door.  As he began to tell Garza about the cigarette argument, defendant walked through the door.  Defendant demanded to know if they were talking about him; Muniz responded they were.  Muniz got up and approached defendant, who turned around and shot Muniz in the shoulder.  Muniz never saw the gun before the shooting.

Muniz began struggling over the gun with defendant, and they went out the front door.  Muniz, fearing defendant would fire again, tried to "get ahold of" defendant.  On the porch, Muniz lunged at defendant, who shot him in the abdomen.  The pair fell

off the porch onto the lawn, with Muniz landing on top of defendant. Muniz finally wrested the gun from defendant. . . . As defendant got up, Muniz hit him in the face with the gun. Defendant ran into the house and out the back door. Muniz followed him into the house and put the gun down. Muniz denied taking money or the gun from defendant's bathroom.

Following the shooting, an officer seized the .38 caliber revolver found on the chair. The revolver contained four live rounds and two expended rounds of ammunition. The expended rounds were stamped "Winchester .38 SPL." . . . .

Officers later searched defendant's residence pursuant to a warrant. In a bedroom dresser, they found one live round of .38 caliber-ammunition. In a dining room dresser drawer, officers found a box of .38-caliber . . . ammunition. Each bullet was stamped "Winchester .38 SPL." The box contained 33 live rounds; 17 rounds were missing. At various locations in the dining room and living room, officers found loose .38-caliber rounds and an ammunition box containing two bullets.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Defendant testified in his own behalf. He first met Garza at Townsell's house approximately 10 months before the shooting. Defendant denied selling drugs to Garza and denied she used drugs in his home.

The morning of the shooting, Garza arrived at defendant's house upset about Muniz. Muniz arrived later. Defendant presented Garza with a $25 bill for collect telephone calls she had received at his house. Muniz paid the bill. Muniz and Garza argued about his upcoming trial. Defendant said nothing about getting Garza out of the area to prevent her testifying.

Defendant left the house to buy cigarettes. When he returned, Muniz asked to buy a pack, and defendant offered to sell one for $4. Muniz became angry . . . .After Muniz left, Banise announced her gun and money were missing. Defendant knew nothing of the gun prior to the announcement.

Defendant followed Muniz . . . to ask him if he had Banise's gun and money. Defendant found Muniz in the front room. . . . Muniz rose and defendant saw the gun on the chair next to him. Both men grabbed the gun. As they both pulled at the weapon, defendant began to fall. As he fell, the gun went off. Defendant did not know who pulled the trigger and was unaware Muniz had been hit.

Muniz gained control of the gun, and defendant tried to get out the door. Muniz hit defendant several times with the gun. . . . Defendant grabbed the gun, put his hands over Muniz's hands, and

the gun again went off.  The pair fell off the porch, with Muniz
ending up on top of defendant.  Muniz again had control of the
gun.  Banise ran over and begged Muniz not to shoot defendant. . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

A friend of defendant, also present at defendant's home the day of
the shooting, stated a Chicano man and woman argued about a
deportation hearing.  The woman left, and the man and defendant
argued over cigarettes.

Answer, Ex. D at 2-13 (footnotes omitted).  The jury convicted petitioner of assault with a
firearm and possession of a gun by an ex-felon, but acquitted him of a second charged assault
count.  Compare CT 20-23 (information) and CT 168-169 (information)[1] with CT 270 (verdict).

Petitioner appealed his conviction to the Court of Appeal for the Third Appellate
District, which affirmed his conviction.  Answer, Ex. D (Court of Appeal decision).  The
California Supreme Court denied his petition for review.  Id., Ex. F (order denying review).

Petitioner then filed a habeas petition in San Joaquin County Superior Court,
raising his claims of ineffective assistance of trial and appellate counsel.  Id., Ex. G (Superior
Court petition).  The Superior Court rejected his claims, as did the Court of Appeal and the
California Supreme Court.  Id., Exs. H-L.

II.  Standards Under The AEDPA

An application for a writ of habeas corpus by a person in custody under a
judgment of a state court can be granted only for violations of the Constitution or laws of the
United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any
claim decided on the merits in state court proceedings unless the state court's adjudication of the
claim:

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established federal law, as
determined by the Supreme Court of the United States; or

/////

_____

[1]  The felon in possession of a firearm count was charged separately, but the cases were
consolidated for trial.  CT 172.

1    (2) resulted in a decision that was based on an unreasonable
2    determination of the facts in light of the evidence presented in the
     State court proceeding.

3    28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

4    365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

5    under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

6    Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

7    U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

8    not address the merits of petitioner's Eighth Amendment claim).[2]  Courts are not required to

9    address the merits of a particular claim, but may simply deny a habeas application on the ground

10   that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

11   Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

12   courts to review state court decisions for error before determining whether relief is precluded by

13   § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

14   by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

15          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

16   /////
17   /////
18   /////
19   /////
20   /////
21   /////

22

23          [2]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
     held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
24   claims will have no determinative effect in the case before us . . .  At best, it is constitutional
     dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
25   relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
     28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
26   of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71;
     Ramirez, 365 F.3d at 773-75.

different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u> [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law.  <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002), <u>cert</u>. <u>dismissed</u>, 538 U.S. 919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 598 (9th Cir. 1999).

/////

1  III.  Ineffective Assistance Of Trial Counsel

2      A.  Background

3          Petitioner argues that trial counsel was ineffective for failing to move to suppress

4  the evidence seized as a result of the search of his home at 2005 Scribner Street in Stockton.  Pet.

5  at 24-52; CT 9-10 (search warrant).  He also argues that counsel was disbarred while representing

6  petitioner and asks the court to be "cognizant that counsel's ill conduct has resulted in him being

7  disbarred to practice law."  Pet., Addendum at 58.

8          The search warrant petitioner challenges permitted officers to search petitioner's

9  home for handguns, ammunition or other firearms-related items, as well as personal property

10 showing who had dominion and control over the home, and any bloody clothing or rags.  CT 15.

11         Jay Wagner, the police sergeant who prepared the application for the search

12 warrant, noted that he had talked to the officers who investigated the shooting of Muniz[3] and

13 from them learned the following facts: (1) petitioner told police Muniz had hit him in the head

14 with a gun and that the gun had gone off as they struggled over it; (2) Garza told police that

15 petitioner came to Townsell's house with a gun and that Muniz and petitioner struggled over the

16 gun, which discharged during the grappling; (3) a computer check showed petitioner's address to

17 be 2005 Scribner Street; (4) the affiant knows from training and experience that people who

18 commit firearms offenses may hide evidence in their homes. CT 16-17.

19 /////
20 /////
21 /////
22 /////
23 /////
24 /////

26     [3]  The warrant application refers to Muniz as Nunez.

10

1    The Superior Court rejected petition's collateral attack on counsel's performance:

2        Petitioner contends that he received ineffective assistance of
         counsel at trial.  He claims that counsel failed to move to suppress
3        items of evidence seized from petitioner's home on the ground that
         the affidavit supporting issuance of the search warrant failed to
4        disclose probable cause for the search.  Petitioner contends that he
         received ineffective assistance of appellate counsel in that appellate
5        counsel did not raise this same issue on appeal.

6        The court's review of the record reveals that the search warrant and
         supporting affidavit were valid.  The court further finds that
7        petitioner has failed to demonstrate that he suffered any prejudice
         as a result of counsels' actions.  (*Strickland v. Washington* (1984)
8        466 U.S. 668.)  The petition is therefore denied.

9    Answer, Ex. H.  The Court of Appeal and Supreme Court denied the petitions without comment.

10   Id., Exs. J & L.

11       B.  <u>Ineffective Assistance Of Counsel And The Fourth Amendment</u>

12       The federal law on claims of attorney ineffectiveness is clear:

13       First, the defendant must show that counsel's performance was
         deficient.  This requires showing that counsel made errors so
14       serious that counsel was not functioning as the "counsel"
         guaranteed by the Sixth Amendment.  Second, the defendant must
15       show that the deficient performance prejudiced the defense.

16   <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be

17   whether counsel's assistance was reasonable considering all the circumstances."  <u>Id</u>. at 688.  A

18   court must "indulge a strong presumption" that counsel's conduct falls within the range of

19   competence.  <u>Iaea v. Sunn</u>, 800 F.2d 861, 864 (9th Cir. 1986).  Accordingly, this court must

20   determine whether in light of all the circumstances, the identified acts or omissions were outside

21   the wide range of professional competent assistance and petitioner must overcome the

22   presumption that the act or omission might be an appropriate strategic decision.  <u>Strickland</u>, 466

23   U.S. at 689, 690.

24       Respondent argues that any attack on counsel's effectiveness is foreclosed by

25   <u>Stone v. Powell</u>, 428 U.S. 465 (1976), because petitioner was afforded the opportunity to litigate

26   any Fourth Amendment challenge in the superior court.  In <u>Stone</u>, the Supreme Court held "we

1   conclude that where the State has provided an opportunity for full and fair litigation of a Fourth

2   Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground

3   that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  428

4   U.S. at 494.  In Kimmelman v. Morrison, 477 U.S. 365, 382 (1986), the court recognized that

5   Stone does not bar a Sixth Amendment challenge to counsel's performance, based on counsel's

6   failure to pursue a Fourth Amendment claim.  However, if counsel determines, after appropriate

7   research, that a motion to suppress would be without merit, his failure to pursue such a motion

8   will not be deemed ineffective assistance of counsel.  Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir.

9   1994).

10          C.  Probable Cause

11                  Petitioner challenges the affidavit underlying the search warrant on two bases.[4]

12   First, he argues there was no nexus between the shooting and the objects sought, because police

13   had recovered the gun from Townsell's house after the shooting and knew that petitioner lived in

14   the house and had admitted the shooting.  Second, he contends there was no nexus between the

15   ammunition and his house, apart from the affiant's conclusory statement that people involved

16   with firearms keep ammunition in their homes.

17                  The Supreme Court has held:

18                  [T]he probable cause standard is . . . a practical, nontechnical
                    conception . . . dealing with . . . factual and practical considerations
19                  of everyday life on which reasonable and prudent men, not legal
                    technicians, act.
20

21   Illinois v. Gates, 462 U.S. 213, 231 (1983) (internal citations, quotations omitted).  The court

22   /////

23   /////

24

25          [4]  Petitioner chiefly relies on California case law.  However, a motion to suppress filed in
     California is governed by the standards imposed by the United States Constitution.  United States
26   v. Alexander, 761 F.2d 1294, 1298 (9th Cir. 1985).

1    added:

2                [P]robable cause is a fluid concept–turning on the assessment of
probabilities in particular factual contexts–not readily, or even
3                usefully, reduced to a neat set of legal rules.

4    Id. at 232.  Ultimately,

5                The task of the issuing magistrate is simply to make a practical,
common-sense decision, whether, given all the circumstances set
6                forth in the affidavit before him . . . there is a fair probability that
contraband or evidence of a crime will be found in a particular
7                place.

8    Id. at 238.

9            1.  Nexus Between The Objects Sought And The Crime

10         Petitioner argues that there was no need to search for ammunition because police

11    had the gun, he had admitted the shooting, and ownership of ammunition is not a crime.  He

12    urges that there was no need to search for documents reflecting ownership of 2005 Scribner

13    because he told police where he lived.  Pet. at 31, 34.

14         A warrant may authorize a search not only for fruits or instrumentalities of a

15    crime, but also for items of "evidential value."  Warden v. Hayden, 387 U.S. 294, 300 (1967).  In

16    such a case,

17                [P]robable cause must be examined in terms of cause to believe
that the evidence sought will aid in a particular apprehension or
18                conviction.

19    Id. at 307; United States v. Rubio, 727 F.2d 786, 792 (9th Cir. 1983).

20         Petitioner is correct that mere possession of ammunition may not be a crime.  See,

21    e.g., United States v. Blom, 242 F.3d 799, 808 (8th Cir. 2001).  Nonetheless, probable cause

22    exists to seize items that are not inherently incriminating when they are connected to a crime

23    under investigation.  United States v. Bruce, 109 F.3d 323, 328-29 (7th Cir. 1997) (probable

24    cause to seize shotgun shells when shotgun had been used in robbery under investigation).

25    Ammunition is probative of possession of weapons.  United States v. Cooper, 19 F.3d 1154,

26    1163 (7th Cir. 1994).

1    At the time Sergeant Wagner secured the search warrant, petitioner had not

2    admitted ownership of or any prior contact with the gun, but only that Muniz had used it to hit

3    petitioner in the head and that it discharged during the subsequent struggle over the gun.  CT 16.

4    Although Garza had told police petitioner had approached Townsell's house with the gun, the

5    facts of the case were in dispute.  CT 16-17.  Finding ammunition in the house would be "of

6    evidential value," for it might suggest which of the two involved in the struggle owned or

7    controlled the gun.

8    Even though petitioner had told police he lived at 2005 Scribner, the police were

9    entitled to seek corroboration of that fact, again because ownership or control over the house

10   where ammunition might be found would be of "evidential value" in determining control over

11   the gun and the dynamics of the struggle.

12   2.  Nexus Between The Items Sought And Petitioner's House

13   Petitioner argues the affidavit contained no "specific, articulable facts" suggesting

14   that ammunition or bloody clothing would be found in his house and that Wagner's statement

15   that "individuals who commit crimes such as assault with a deadly weapon often may attempt to

16   secret evidence in their residence" was too conclusory to support a finding of probable cause.

17   Pet. at 33, 38.

18   The Ninth Circuit has explained:

19   Direct evidence linking criminal objects to a particular site is not
     required. . . . Rather, the magistrate need only determine that a fair
20   probability exists of finding evidence considering the type of
     crime, the nature of the items sought, the suspect's opportunity for
21   concealment . . . .  In making its determination, the court issuing
     the warrant is entitled to rely on the training and experience of
22   police officers.

23   United States v. Parks, 285 F.3d 1133, 1142 (9th Cir. 2002) (internal quotations and footnotes

24   omitted); see also United States v. Gil, 58 F.3d 1414, 1418 (9th Cir. 1995) ("[b]ased on the

25   nature of the evidence and the type of offense, a magistrate may draw reasonable inferences

26   about where evidence is likely to be kept" and may rely on officer's training and experience).  In

1    evaluating an affidavit, magistrates[5] are "not to be confined by niggardly limitations or by

2    restrictions on the use of their common sense." <u>United States v. Ellsworth</u>, 647 F.2d 957, 964

3    (9th Cir. 1981).

4          Despite the lack of "direct evidence," it was reasonable for the issuing magistrate

5    to "infer that where a gun is located, ammunition is likely to be found," <u>United States v.</u>

6    <u>Newman</u>, 685 F.2d 90, 92 (3d Cir. 1982), to accept that "gun owners typically keep guns in their

7    homes," <u>United States v. Pope</u>, 330 F.Supp.2d 948 956 (M.D. Tenn. 2004), and to "conclude that

8    possessors of . . . firearms are likely to have additional weapons and ammunition in their home."

9    <u>United States v. Stefanson</u>, 648 F.2d 1231, 1237 (9th Cir. 1981).

10         Accordingly, whether Wagner's conclusion, based on his undefined experience

11    was a sufficient basis to link petitioner's home to the evidence sought, the magistrate was entitled

12    to rely on his or her own common sense in evaluating whether the affidavit established probable

13    cause.  <u>Compare</u> <u>United States v. Hendershot</u>, 614 F.2d 648, 654 (9th Cir. 1980) ("Nor is a

14    conclusion of the affiant, '(b)ased on my experience from prior bank robbery investigations,'

15    improper.  It is not necessary to detail that experience to determine that the conclusion is not

16    capricious") <u>with</u> <u>United States v. Schultz</u>, 14 F.3d 1093, 1097 (6th Cir. 1994) (officer's training

17    and experience "cannot substitute for the lack of evidentiary nexus . . . between the safe deposit

18    boxes and any criminal activity"); <u>see also</u> <u>Pope</u>, 330 F.Supp.2d at 956.  The Third Circuit

19    reached just such a result in <u>Newman</u>:  it found that the affiant's conclusory statement of belief,

20    based on experience, that ammunition would be found in defendant's office insufficient to

21    establish probable cause, but upheld the search because of the common-sense connection between

22    guns and ammunition.  685 F.2d at 92.

23         Finally, whatever the weaknesses of the affidavit supporting the warrant, it is

24    unlikely that a motion to suppress would have been successful.  In <u>United States v. Leon</u>, 468 U.S.

25

26        [5] In California state courts, the correct title for the officer who typically issues a warrant is "magistrate."  <u>See</u>, <u>e.g.</u>, Cal. Penal Code § 1526.

897, 922-23 (1984), the Supreme Court held that evidence obtained pursuant to an invalid search warrant should not be excluded if the officers who executed it relied with objective good faith on the issuing magistrate's probable cause determination.

In Schultz, the Sixth Circuit applied Leon to uphold the search of a safe deposit box when the warrant had been based on the affiant's one-line claim that his training and experience led him to believe evidence of drug dealing would be found there:

> Schulz is correct that a warrant so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable may be suppressed even when, as here, the warrant is facially valid and there is no evidence of bad faith or a biased magistrate.  But we cannot say this warrant was "so lacking."  As previously discussed, Officer Ideker certainly had probable cause to believe that Schultz had committed a crime.  Moreover, although we have held that his "training and experience" were not sufficient to establish a nexus of probable cause between the crime and the safe deposit boxes, the connection was not so remote as to trip on the "so lacking" hurdle.

14 F.3d at 1098; see also United States v. Washington, 380 F.3d 236, 242-43 (6th Cir. 2004) (sufficient connection between home and drug dealing to establish good faith).

In light of these cases, this court does not find the Superior Court unreasonably applied federal law in finding that counsel's failure to file a motion to suppress the evidence seized from petitioner's house did not violate petitioner's Sixth Amendment rights.  Williams v. Locke, 403 F.3d 1022, 1026 (8th Cir. 2005).

D.  Counsel's Status

Petitioner alleges that trial counsel Todd Corren was disbarred while involved in petitioner's case and suggests that this shows counsel did not act effectively in representing petitioner.

The jury returned the verdicts against petitioner on September 22, 2000.  CT 441-447 (verdict forms).  On November 2, 2000, the State Bar disciplined Corren by suspending his right to practice.  See <http://members.calbar.ca.gov/search/member_detail.aspx?x85790>

(accessed 8/23/06) (State Bar Disciplinary Record).  Corren appeared in court with petitioner on November 3, 2000 and was relieved as counsel.  CT 504.  At the next appearance, petitioner was represented by new counsel, Richard Gibson, who represented petitioner through a motion for new trial and sentencing.  CT 506, 548.  Corren was disbarred on February 5, 2003.  See State Bar Disciplinary Record.

In United States v. Ross, 338 F.3d 1054, 1055 (9th Cir. 2003), cert. denied, 540 U.S. 1168 (2004), the Ninth Circuit held that a lawyer disbarred before a criminal trial, who nevertheless represents the criminal defendant, is not "per se ineffective."

> It is true that counsel's disbarment or suspension may raise doubts about his competence.  But these doubts would arise whether the disbarment occurred during trial or before it.  In any case . . . the actual effects of any such doubts are appropriately addressed under the same rubric generally applicable to claims of ineffective assistance of counsel: the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), actual deficient performance plus prejudice.

Id. at 1056; see also United States v. Rondon, 204 F.3d 376, 379-80 (2d Cir. 2000) (lawyer's suspension during trial is not equivalent to per se ineffective assistance of counsel).  Petitioner's reliance on Corren's suspension and ultimate disbarment adds nothing to his claim of ineffective assistance of counsel.

IV.  Ineffective Assistance Of Appellate Counsel

Petitioner challenges appellate counsel's competence, based on her failure to challenge the search warrant and trial counsel's failure to file a motion to suppress.  Pet. at 5.

The Strickland standards apply to appellate counsel as well as trial counsel.  Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the ability of

1  counsel to present the client's case in accord with counsel's professional evaluation would be

2  "seriously undermined."  Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998)

3  (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even

4  particularly good appellate advocacy").  There is, of course, no obligation to raise meritless

5  arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a showing of

6  deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a

7  weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this context,

8  petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on

9  appeal.  Id. at 1434 n.9.

10         In light of this court's determination that the warrant was adequate and trial

11  counsel was not ineffective, it cannot find appellate counsel's performance inadequate when

12  reviewed through the Strickland lens.

13  V.  Jury Instruction Error

14       A.  General Principles

15         Claims of error in state jury instructions are generally matters of state law, which

16  do not raise constitutional questions unless the errors amount to a deprivation of due process.  .

17  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  A deprivation of due process occurs if a

18  jury instruction deprives a criminal defendant of a fair trial.  See Dunckhurst v. Deeds, 859 F.2d

19  110, 114 (9th Cir. 1988).

20       B.  Unanimity Instruction

21         Petitioner challenges the trial court's failure to give an instruction requiring the

22  jury to agree unanimously as to the act forming the basis for each count.[6]  He argues that the

23  _____

24  [6]  The California form instruction on unanimity reads:

25  The defendant is accused of having committed the crime of _____ [in
    Count _____].  The prosecution has introduced evidence for the

26  purpose of showing that there is more than one [act] [or] [omission] upon which a
    conviction [on Count _____] may be based.  Defendant may be found

18

1    evidence showed several distinct acts that a jury might use as a basis for each count and that the

2    failure to so instruct implicates his Fourteenth Amendment rights.  Pet., Addendum at 24-38.

3           The Court of Appeal rejected this argument:

4           Here, the evidence at trial revealed two shots were fired during the
            incident.  Both shots wounded Muniz.  The information charged
5           defendant with two counts of assault with a firearm.  The trial court
            instructed the jury . . . that the two counts . . . charged distinct
6           crimes to be decided separately.  The instruction informed the jury
            that defendant could be found guilty or not guilty of either or both
7           assault counts.

8           Defendant argues that the prosecutor never stated which count
            corresponded to which shot, a point the People concede.  Therefore,
9           it is impossible to determine beyond a reasonable doubt that the jury
            agreed on the same act in convicting him of one of the assault
10          counts.

11          While the prosecutor never spelled out the link between the shots
            and the corresponding counts, it is reasonable to believe the jury
12          would draw logical connections between the evidence adduced at
            trial and the sequence of the charges, associating the first count with
13          the first shot and the second with the second shot.  During closing
            argument, the prosecutor informed the jury that defendant was
14          "accused of two counts of assault with a firearm, one count for each
            shot."  The jury, faced with two assault counts and two shots, would
15          logically infer the temporal relation between the shots dictated their
            correspondence to the counts.

16
            Defendant also contends the court erred in failing to instruct the jury
17          with CALJIC No. 17.01 [the unanimity instruction] as to the count
            charging defendant with being a convicted felon in possession of a
18          firearm.  We disagree.

19          The court instructed the jury regarding actual and constructive possession
            of a firearm.  The court also informed the jury proof of the crime required a
20          showing that defendant "owned or had in his possession or had under his
            control a revolver" and that he had "knowledge of the presence of the
21          firearm."

22    _____

23          guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any
      one or more of the [acts] [or] [omissions]. However, in order to return a verdict of
24    guilty [to Count _____], all jurors must agree that [he] [she]
      committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not
25    necessary that the particular [act] [or] [omission] agreed upon be stated in your
      verdict.

26    CALJIC No.  17.01.

1
2
3
4
5

> The evidence revealed only one act upon which the conviction of being a convicted felon in possession of a firearm could be based: defendant's carrying of the gun into Townsell's house prior to the shooting.  During both opening and closing arguments, the prosecution referred to defendant's carrying the gun across the street from defendant's residence and into Townsell's residence.  Muniz and Garza testified defendant carried the gun to Townsell's house. We find the other scenarios offered by defendant unpersuasive.

6  Answer, Ex. D at 16-17 (footnotes omitted).

7       In Apodaca v. Oregon, 406 U.S. 404, 406 (1972), the Supreme Court rejected a

8  Sixth Amendment challenge to a statute that permitted a criminal defendant to be convicted by ten

9  of twelve jurors, while in Johnson v. Louisiana, 406 U.S. 356, 362 (1972), it rejected a Fourteenth

10  Amendment challenge to a similar statute.  The courts have interpreted these cases as meaning

11  that the Constitution does not impose a jury-unanimity requirement, at least in non-capital cases.

12  Richardson v. United States, 526 U.S. 813, 821 (1999) ; Hoover v. Johnson, 193 F.3d 366, 369

13  (5th Cir. 1999); see Jeffries v. Blodgett, 5 F.3d 1180, 1195 (9th Cir. 1993) (capital case; court

14  considered challenge to absence of unanimity instruction).  Petitioner recognizes this line of

15  authority, but argues nevertheless that the absence of such an instruction violated his Fourteenth

16  Amendment rights.

17       Despite its unanimity cases, the Supreme Court has recognized that:

18
19
20

> [N]othing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of "Crime" so generic that any combination of jury findings on embezzlement, reckless driving, murder, burglary, tax evasion or littering, for example, would suffice for conviction.

21  Schad v. Arizona, 501 U.S. 624, 633 (1991); see also Richardson, 526 U.S. at 820.  Lower federal

22  courts have recognized the Fourteenth Amendment implications of a situation when only six

23  jurors agree that one specific illegal act was committed, while the other six agree that a different

24  illegal act was committed, but the jury as a whole returns a guilty verdict.  Even without

25  unanimity as to all principal factual elements underlying the specified offense, the jurors are able

26  to produce an inappropriate guilty verdict because they are all of the opinion that some illegal act

was committed.  See United States v. Correa-Ventura, 6 F.3d 1070, 1082 (5th Cir. 1993).  When

the acts forming the basis of conviction occurred at different times and places and involved

different means, the Ninth Circuit has found the need for a specific unanimity instruction to

obviate the potential for juror confusion and a resulting non-unanimous verdict.  United States v.

Payseno, 782 F.2d 832, 836-37 (9th Cir. 1986).

### 1. Assault With A Deadly Weapon

As the Court of Appeal observed, the jury was instructed generally that "[e]ach

count charges a distinct crime.  You must decide each Count separately."  CT 322; CALJIC No.

17.02.  A jury is presumed to follow its instructions.  Weeks v. Angelone, 528 U.S. 225, 234

(2000).

Moreover, the evidence in this case was not complex: there were two shots fired,

each of which, petitioner claimed, was an accidental product of the struggle over the gun.  Nor

were there numerous acts that could correspond to each of the charged counts: there were two

charges and two shots.  Finally, the jurors showed no confusion about the assault charges

themselves; their only uncertainty was whether they had to fill in the verdict forms for the use and

great bodily injury enhancements if they found petitioner not guilty of one of the assaults.  CT

438.

### 2. Felon In Possession Of A Firearm

In California, possession of a firearm by an ex-felon may be actual or constructive,

so long as it is knowing and intentional.  People v. Spirlin, 81 Cal.App.4th 119, 130 (2000).  The

crime is committed when the felon has the gun within his control.  People v. Ratcliff, 223

Cal.App.3d 1401, 1409 (1990).  Accordingly, petitioner's conviction could have been based on

the presence of the gun in his home or his use of it during the struggle with Muniz.[7]

---

[7] An exception exists when a felon reasonably believes himself to be in danger and takes advantage of a firearm made available to him.  People v. King, 22 Cal.3d 12, 24 (1978).  The jury was so instructed in this case.  CT 321.

1   From the presence of the ammunition in the home and Isaac Olden's claim to have

2   seen a gun in the bathroom of petitioner's house, the jury could have found petitioner guilty based

3   on his constructive possession of the weapon before the incident with Muniz.  RT 463.

4   Accordingly, the Court of Appeal's conclusion that there was only one act upon which the

5   conviction could be based is not a reasonable determination of the facts.

6   Nevertheless, this was not a case of complex evidence or other factors that might

7   cause jury confusion.  The parties and even the jury focused on the relationship of the gun and the

8   struggle with Muniz: the prosecutor mentioned the concept of constructive possession, RT 1505-

9   1506, but dwelt on petitioner's walking across the street with the gun to confront Muniz.  RT

10   1518, 1521.  Defense counsel discussed the struggle and petitioner's limited right to possess the

11   weapon in this dangerous situation.  RT 1537-1538, 1542-1543.  The jury's questions focused on

12   the struggle, for they asked the court reporter to reread Garza's initial statement to the police and

13   petitioner's testimony about his contact with the trigger during the struggle.  CT 439, 440.  This

14   was not a situation with the potential for a jury verdict based on a combination of findings on

15   "embezzlement [and] reckless driving."  Cf. Schad, 501 U.S. at 633.

16   C.  The Accident Instruction

17   The jury was instructed that

18   When a person commits an act or makes an omission through
    misfortune or by accident under circumstances that show no
19   criminal intent, he does not thereby commit a crime.

20   CT 307; RT 1477.

21   Petitioner argues that the instruction on accident did not adequately inform the jury

22   that the defense need only raise a reasonable doubt that the shootings were accidental.  The Court

23   /////

24   /////

25   /////

26   /////

22

of Appeal rejected this argument:

> In the present case, the trial court did not modify CALJIC No. 4.45 to reflect the various burdens of proof imposed on the parties. However . . . the court provided other instructions accurately informing the jury of the burden of proof imposed on both the defendant and the prosecution.

> The court instructed pursuant to CALJIC No. 9.00,[8] which informed the jury that, in order to convict defendant of assault, the prosecution must prove each element of the crime. The prosecution's burden included proving defendant "willfully" and unlawfully committed an act, here the shooting of a gun, which by its nature would probably and directly result in the application of physical force on another person. The word "willfully" was defined as "intentionally." The court also instructed with CALJIC No. 2.90, which told the jury the prosecution had the burden of proving the elements of the crime beyond a reasonable doubt.[9] Therefore, the jury was aware the prosecution had the burden of proving beyond a reasonable doubt that defendant intentionally fired the gun that injured Muniz.

> These instructions, when coupled with CALJIC No. 4.45, adequately conveyed the respective burdens of proof. CALJIC No.

---

[8] CALJIC 9.00 provides in pertinent part:

> In order to prove an assault, each of the following elements must be proved:

> 1. A person willfully and unlawfully committed an act which by its nature would probably and directly result in the application of physical force on another person . . .

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> "Willfully" means that the person committing the act did so intentionally.

CT 313-314; RT 1472-1473.

[9] CALJIC 2.90 is the basic reasonable doubt instruction, which reads in pertinent part:

> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in the case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.

CT 302; RT 1471.

4.45 informed the jury that if the shooting was by accident and under circumstances showing a lack of criminal intent, defendant did not commit a crime.  The jury received no instructions requiring defendant to prove his lack of criminal intent beyond a reasonable doubt.  The jurors, following these instructions, were compelled to impose a requirement of proof beyond a reasonable doubt on the prosecution but no such burden on defendant.  Defendant only had to raise a reasonable doubt that the shooting was done intentionally for the jury to acquit him.

The crucial assumption underlying the constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.  Thus, we presume the jurors followed the trial court's instructions.

Answer, Ex. D at 23-24 (citations omitted).

In People v. Gonzales, 74 Cal.App.4th 382 (1999), the state appellate court noted that accident is a defense, which negates proof of willfulness; a defendant need only raise a reasonable doubt of the existence of willfulness.  Petitioner argues that the court's instruction on accident failed to inform the jury that the prosecution bore the burden of proving that the act was not committed by accident.  Pet., Addendum at 49.

This court must determine whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  Estelle v. McGuire, 502 U.S. 62, 72 (1991).  This undertaking cannot focus on the isolated instruction, but "must be viewed in the context of the overall charge."  Middleton v. McNeil, 541 U.S. 433, 437 (2004).

The "clearly established federal law" against which this claim must be measured is In re Winship, 397 U.S. 358 (1970), which recognized that the due process clause requires "proof beyond a reasonable doubt" of every element necessary to a finding of guilt.  A jury instruction that, in context, fails to give effect to that requirement violates a defendant's constitutional rights.  Bruce v. Terhune, 376 F.3d 950, 955 (9th Cir. 2004).

In this case, however, the jury was instructed on the prosecutor's burden to prove every element of the crime beyond a reasonable doubt and was told it must find petitioner acted "willfully" before it could find him guilty of assault.  The jury's determination that petitioner

1   acted willfully, that is, intentionally, means it concluded the prosecution had proven that petitioner

2   had not discharged the gun accidentally.  Black's Law Dictionary (7th ed. 1999) at 15 (accident is

3   "an unintended and unforeseen injurious occurrence . . . .").  Taken in context, the failure to

4   define the burden of proof in the accident instruction was not error.  McNeil, 541 U.S. at 437-38;

5   Leavitt v. Arave, 383 F.3d 809, 833 (9th Cir. 2004), cert. denied, ___ U. S. ___, 125 S.Ct. 2540

6   (2005).

7       D.  CALJIC No. 17.41.1

8           The court instructed the jury in the language of CALJIC No. 17.41.1, which

9   informs the jury, in part, that if "any juror refuses to deliberate or expresses an intention to

10  disregard the law or to decide the case based on penalty or punishment, or any other improper

11  basis, it is the obligation of the other jurors to immediately advise the Court of the situation . . . ."

12  CT 331.

13          The Court of Appeal rejected petitioner's challenge because he presented nothing

14  showing the impact of the challenged instruction on deliberations.  Answer, Ex. D at 25.

15          In Brewer v. Hall, 378 F.3d 952 (9th Cir.), cert. denied, 543 U.S. 1037 (2004), the

16  Ninth Circuit rejected a challenge to the same instruction:

17              It is clear, however, that the California appellate court's holding was
                not contrary to or an unreasonable application of clearly established
18              Supreme Court precedent, because no Supreme Court case
                establishes that an instruction such as CALJIC 17.41.1 violates an
19              existing constitutional right.

20  378 F.3d at 956.

21  VI.  The Hypothetical Question

22      A.  Background

23          Petitioner testified that as he walked through Townsell's door, he saw Muniz grab

24  the gun by its barrel.  Petitioner moved toward it and grabbed the handle.  Muniz pushed

25  petitioner and as petitioner fell backward, the gun discharged.  RT 1324-1325.  Muniz's hands

26  were on the barrel, around the cylinder and the trigger guard, while petitioner's hands were on the

handle as the gun discharged.  RT 1325, 1402, 1406, 1408.  As petitioner ran for the door, Muniz

hit him in the head with the gun; petitioner grabbed the gun, which once again discharged.  RT

1327.  Petitioner believed Muniz was still holding the gun near the cylinder and trigger guard

when it discharged the second time.  RT 1415.  Petitioner could not remember whether his finger

had been on the trigger either time the gun discharged, but knew that both he and Muniz were

pulling on it each time.  RT 1429-1430.

   In rebuttal, the prosecutor called Cliff Johnson, a police officer with experience as

a firearms instructor.  RT 1497.  Johnson testified that if the cylinder on the gun involved in this

case was prevented from rotating, one could not pull the hammer back or pull the trigger.  RT

1498.  The prosecutor then asked:

> If somebody has his hands over the cylinder in this fashion
> (indicating) and another man has two hands – like [petitioner's]
> testimony, has two hands on the gun, one on the victim's hands, is
> that going to interfere with the ability of the cylinder to rotate when
> you pull the trigger?

RT 1498.  Defense counsel objected and argued there had been no evidence as to the firmness of

anyone's hands on the cylinder.  Id.  The court overruled the objection and permitted Johnson to

testify this would affect the ability of the cylinder to rotate.  Johnson added that it would not take

a lot of force to prevent the cylinder from rotating, but conceded he had no real idea how much

pressure was exerted on the cylinder during the struggle.  RT 1498-1499.  He acknowledged that

the gun could still be fired even if two people had their hands partially on the cylinder.  RT 1501.

   The Court of Appeal rejected the challenge:

> Although defendant concedes the trial court possesses "'great
> discretion'" in ruling on evidentiary objections, he contends the
> court abused this discretion in allowing the hypothetical based on
> the dearth of evidence as to how much pressure Muniz applied to
> the cylinder.  This gap in the evidence rendered the question
> misleading and unfair.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

1         Under the standard enunciated in *Wilson*,[10] we find the court
properly allowed the challenged hypothetical.  The question

2         assumes Muniz applied enough pressure to possibly stop the
rotation of the revolver's cylinder.  Such an assumption is based

3         upon facts "within the limits of the evidence." . . . As the
prosecution noted during closing argument, "[I]f I'm in a fight for

4         control of a gun, I'm holding on for all I'm worth."  As the two men
fought over possession of the gun, an assumption of a firm, tight

5         grip is not unfair or misleading.

6         As one appellate court has noted: "'It is not essential to the
propriety of a hypothetical question that the facts assumed should be

7         undisputed.  The question is proper if it recites only facts within the
possible or probable range of the evidence and if it is not unfair or

8         misleading [Citations.]  The truth or falsity of the purported facts
upon which an expert bases his opinion is for the trier of fact to

9         determine.  (*Foremost Dairies v. Industrial Acc. Com*. (1965) 237
Cal.App.2d 560, 570-571.)  We find no error in the trial court's

10        evidentiary ruling.

11 Answer, Ex. D at 20-21.

12         The court instructed the jury on the function of a hypothetical question, telling the

13 jury that "in permitting such a question, the Court does not rule and does not necessarily find that

14 all of the assumed facts have been proved.  It only determines that those assumed facts are within

15 the possible range of the evidence."  RT 1470.  It also told the jury that if the jury decided any of

16 the assumed facts were not true, it could determine the effect of the failure of proof on the value

17 of the testimony.  Id.

18      B.  Analysis

19         Challenges to expert testimony present questions of state law, not cognizable in a

20 federal habeas proceeding, unless the testimony violates due process or some other federal

21 constitutional right.  Keller v. Larkins, 251 F.3d 408, 419 (3d Cir. 2001); Rice v. State of

22 Wisconsin, 424 F.2d 12, 13 (7th Cir. 1970); see generally Estelle v. McGuire, 502 U.S. 62, 75

23 (1991) (state evidentiary rulings do not raise a constitutional issue unless they "so infuse the trial

24 with unfairness as to deny due process of law").

25

26        [10]  People v. Wilson, 25 Cal.2d 341 (1944).

1    The hypothetical question in this case did not rise to the level of a due process

2 violation.  Although the question may not have incorporated all the variables defendant thought to

3 be appropriate, it was based on the testimony developed at trial, none of which was inherently

4 inflammatory.  Moreover, the jury was instructed to consider limitations on the expert testimony

5 stemming from any shortcomings in the testimony's factual underpinnings, which defense counsel

6 was free to explore.  The state court did not err in rejecting this claim on habeas review.

7    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

8 writ of habeas corpus be denied.

9    These findings and recommendations are submitted to the United States District

10 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

11 days after being served with these findings and recommendations, any party may file written

12 objections with the court and serve a copy on all parties.  Such a document should be captioned

13 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14 shall be served and filed within ten days after service of the objections.  The parties are advised

15 that failure to file objections within the specified time may waive the right to appeal the District

16 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17 DATED:  August 23, 2006.

18

19

20 UNITED STATES MAGISTRATE JUDGE

21

22

23

24 2
garr2613.157

25

26